## COMMON PLEAS AND PROBATE COURTS OF OHIO,

ALSO OF THE

## SUPERIOR COURT OF CINCINNATI,

SPECIAL AND GENERAL TERMS.

---

(Cuyahoga County Court of Common Pleas.)

THE LAKE SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY,
A CORPORATION, *v.* THE CITY OF CLEVELAND ET AL.

1. Where an allotment is made in partition proceedings, by the express terms of which a right of way is reserved *to the owners of the land allotted* on and along the streets marked and laid down on a map attached to, and made a part of said proceedings, such right of way is limited to such owners, and does not constitute a dedication of said streets to the public. Such dedication cannot be extended beyond the terms limited by the dedicators, although such streets may have been open to use by the public, and ordinances may have been passed by the common council in regard to them; and the streets may have been described and set forth in conveyances on record for many years.
2. Non-user of streets within a municipal corporation, by the public, must continue for twenty-one years, in order to work an abandonment.

(Decided September, 1894.)

---

NOBLE, J.

In the case of The Lake Shore & Michigan Southern Railway Company against The City of Cleveland, the plaintiff sets forth in its petition that it is now, and has been for many years, the owner of a continuous line of railroad from Buffalo, in the state of New York, through Cleveland, to the city of Chicago; that its business is that of a common carrier; that a portion of its tracks in this city, and many of its side-tracks, switches and turn-outs—all of which are in constant use, and necessary in the operation of its road—are located upon and extended across what is known as "the Island property," bounded on the north by Lake Erie, on the east by the Government Pier and the Cuyahoga river, on the south by the old river bed, and on the west by the old river bed and a line from the north-westerly end thereof extended to the waters of the lake; that it has been for more than twenty-one years the owner of all property occupied by any of its said tracks, side-tracks, switches and turn-outs, upon the premises so described as the Island property; and that it, and those from whom it acquired said premises, have been in constant, uninterrupted and undisturbed possession, use and enjoyment of the same for more than twenty-one years last past; that its possession and occupation has been open, notorious, and adverse to the defendants, with claim of title thereto; that on September 12, 1892, the common council, unlawfully and without authority, passed a resolution, directing the Director of Public

Works to at once take possession of some portions of said premises, but which portions it is unable to designate, and to remove therefrom its tracks and other structures; and that the Director of Public Works, acting on this instruction, is about to unlawfully enter upon the premises so owned and occupied by said railroad company, for the purpose of tearing up and removing therefrom the main tracks, side-tracks, switches, turn-outs and other improvements so placed there, and now used by it.

And the plaintiff says, further, that it has no adequate remedy at law; and that, unless restrained by the court, defendants will unlawfully and without authority of law, at once cause said main tracks, side-tracks, switches and turn-outs, to be torn up and removed, thereby making it impossible for it to operate its road and conduct its business, to its great and irreparable injury; that an injunction is asked for by reason of these facts, restraining defendants from in any manner interfering with plaintiff in its use and occupation and possession of the premises described, or in the operation of its road upon said premises; and restraining them from removing any of its tracks, side-tracks, switches and turn-outs, or other structures upon said property, and for all such other and further relief as is equitable.

The right to an injunction is based entirely upon ownership by the Lake Shore & Michigan Southern Railroad Company of the property occupied by its tracks, side-tracks, switches, and turn-outs upon the Island property, and its use, occupation and enjoyment, either by it or its grantors, for more than twenty-one years last past; such use, occupation and enjoyment having been, as is claimed, notorious, and adverse to the city, with claim of title thereto.

The answer and cross-petition of the city denies this, and sets up a state of facts by virtue of which it claims affirmative relief against the plaintiff. It says that on the 12th day of September, 1892, the common council adopted the following resolution:

"Resolved, That the Director of Public Works be, and he is hereby instructed and directed, to remove all obstructions from those parts of the following named avenues and streets lying north of the northerly line of Bennett street, to-wit: Waverly avenue, and Andrews, Giddings, Union, Hanover, Hickory, Mulberry, Center, Elm, Sycamore, and West River streets, and to prevent any and all encroachments thereon."

That it is the duty of the Director of Public Works to carry out these instructions in a lawful manner. And it says, further, that the Island property—so-called—was allotted by its former proprietors, and various streets and highways dedicated to, and accepted by the public; that in 1796, Seth Pease, under the direction of Augustus Porter, agent for the Connecticut Land Company, made a survey of the original town of Cleveland, and a plat thereof, called "Plan of the City of Cleveland," which was accepted by the company, and accepted by the public as a plat and allotment of the town of Cleveland, although not recorded in Ohio.

Subsequently, in 1800, a law was passed by the territorial legislature of Ohio, requiring such plats to be recorded, and in 1801 the Connecticut Land Company caused a new survey to be made by Amos Spafford, in accordance with the survey of Pease, and a plat thereof was duly filed in the recorder's office of Trumbull county, wherein the village of Cleveland was then situated. Subsequently, when Cuyahoga county was organized, it was duly filed here on November 21, 1814.

By reason of the premises, defendant claims that the lands embraced

in the plat, including Bath street, were properly dedicated, and accepted by the proper authorities.

Subsequently, in 1826, the United States government changed the channel of the Cuyahoga river near its mouth, by a cut through to the lake, leaving a portion of Bath street as originally laid out, on the west side of the river, and included in the Island property. That portion of Bath street so cut off and transferred to the west side of the river, is particularly bounded and described in the cross-petition.

The defendant claims that the part so cut off, still remained a public highway and street, and under the supervision and control of the municipal corporation within whose limits it was situated; that it remains so still, and that the city now has the care, supervision and control over it.

Defendant further says that in 1831–2, Alonzo Carter dedicated to the public, for a street, a strip of land sixty-six feet wide, commencing at a point on the west side of the river opposite the foot of Superior street, and running along near the west bank of the river to the lake; that the public accepted it properly, and that it was called Lake street; that in 1832 the county commissioners laid out a county road sixty-six feet wide, beginning at the intersection of Center and Detroit streets, and thence along the westerly side of the river to the lake, including Lake street within its limits; and it was then accepted by the proper authorities and called River street, and subsequently West River street.

Further, the defendants say that in 1833 the so-called Buffalo Company's allotment was laid out and dedicated, and accepted by the proper authorities, and properly recorded, whereby fourteen feet were added to the westerly side of West River street for a considerable distance, making it eighty feet wide. By this same allotment Sycamore street, Old River street, and Willow street were laid out, the first two being sixty-six feet wide, and the latter fifty feet wide. In the same year owners of lots lying west of West River street—as it is now called—and north and east of the old river bed—so called—and south of Lake Erie, being the greater part of the Island property, aparted their lots, and properly recorded a plat thereof, whereby and whereon they laid out and dedicated certain lands and streets to public uses for highway and street purposes, the streets, except Willow, which was fifty feet, being sixty-six feet wide, and called Sycamore, Elm, Center, Mulberry, Hickory, West, Union, Giddings, Andrews, Old River, Willow, Macey, Thompson, Tyler, Baldwin, Pratt, Carter and Bennett streets. And they say that these streets were duly recognized and accepted by the public and other proper authorities.

Furthermore, they say that in 1848 Charles Whittelsey and William B. Lloyd made an allotment of certain lands contiguous and adjacent to Bath street on the west side of the river, and recorded a plat thereof, and thereby laid out and dedicated lands and streets known as Albert and William—now called Toledo street,—each sixty-six feet wide, and certain alleys not named, sixteen and a half feet wide; and that these were recognized and accepted by the public and the proper authorities; that over all the streets and alleys mentioned, the proper authorities have always exercised control, and the city of Cleveland has had for many years, and now has, the supervision and control over the same for street purposes, and that it is required to keep them open, in repair, and free from all obstructions.

In May, 1851, the common council of the city of Ohio passed a resolution giving the Junction Railroad Company—to whose rights the plaintiff,

it is said, has succeeded—the right to lay its tracks, under the direction of the committee on streets for that year, in certain streets, and the company did lay one main track in and along Bennett street and Bath street, and across Andrews, Giddings, Union, West, Hickory, Mulberry, Center, Elm, Sycamore, West River and Lloyd streets. But the City says that the permission thus granted was, and is still, subject to revocation, and to the use and improvement of the streets by the city of Ohio, and its successor, the city of Cleveland; and the company's use of these streets was, and is subservient to the use and improvement thereof by the city, and the public generally, for street purposes. That shortly after laying this track, the company abandoned the use thereof, and for thirteen years did not occupy the same, and it is claimed the company thereby lost its right to use these streets, and that the permission granted has fully terminated and ceased. That in 1854 the city of Ohio was annexed to the city of Cleveland, and the latter succeeded to all its rights in said streets; that in July, 1854, the city, by its mayor, A. C. Brownell, undertook to give to the Cleveland & Toledo Railroad Company—successor to the Junction Railroad Company—and to the Cleveland & Mahoning Railroad Company, certain privileges in Bath street, west of the river, but that it had no authority to do so, and that it was therefore void, and that in fact the grantee never undertook any action under it.

It is further claimed, that in 1866 the city of Cleveland gave the Cleveland & Toledo Railroad Company permission to occupy, for railroad purposes, any streets north of the old river bed, east of and including Elm street, and west of the Cuyahoga river, provided that the company relinquished to the city any rights it then had to occupy other streets west of the river, except its right on its main line, and provided the right to occupy said streets should not infringe on the rights of adjacent lot owners, and the company should not prevent the city at any time directing and requiring the said streets to be graded, or otherwise improved, according to law and the ordinances of the city. This permission by the city is, however, claimed to be subject to revocation by the city, whenever it should deem it for the advantage of the city and the public to use said streets exclusively for street purposes, and that it is subject to the use and improvement of the streets by the city, and the public generally, for street purposes.

The city claims further, that under said permission the company has a temporary right to use the said streets west of Elm street for one main track on its main line; and on said streets lying east of the west line of Elm street, north of the old river bed, and west of the river, to use the same for such number of main and side-tracks and switches, as will not interfere with the proper use and improvement of all of said streets by the city, or the public generally, for the usual and ordinary purposes of streets and highways.

It is said that under color of the authority so granted, the company has laid an additional main track along Bennett street west of Elm street, and across Center, Mulberry, Hickory, West, Union, Giddings, and Andrews streets, and also three side-tracks, and several switches along Bennett street west of Elm, and across Center, Mulberry, and Hickory, south of said main tracks, and has located, erected, and maintained buildings, shops, structures, shanties, tanks, derricks, piles of lumber and iron, and various other obstructions, all contrary to, and without the permission given by the city, and against the law of the state, and inconsistent with the use and improvement of streets as public highways. And the city says

further, that recently the company has laid side-tracks and switches in and across Mulberry, Hickory, West, Union, Giddings, and Andrews streets, north to the north line of Bennett street, without any authority, and that the same are unlawful obstructions.

It is further alleged that the railroad company disclaims the superior authority of the city over these streets, and repudiates the permission given, and pretends to hold them adversely, and contrary to the rights of the city, and asserts that no part of the land within the limits of these streets should be devoted to the purposes for which they were given and dedicated, to-wit: street purposes. And the city says that the common council now deems it necessary, and for the interest and advantage of the city and the public generally, to remove all tracks and other obstructions from those of its streets north of the northerly line of Bennett street, and to prevent any and all encroachments thereon; and that in view of the company's disclaimer of the city's interest in these streets, it is the duty of the city to establish its paramount rights; and that if it is prevented from removing the tracks and obstructions—except such as the council has permitted to be laid, subject, however, to the use and improvement of the streets as public highways —and clearing up and improving the same, so as to make them fit for travel as streets, it would be doing the city and the public irreparable injury.

In conclusion, the city prays for an order and decree, fixing and determining the rights of the city in all of said streets, highways and alleys, and that plaintiff's use thereof for railroad purposes is derived from the resolution adopted by the council of the city, and subject to revocation at any time the council may deem it for the interest of the city, and the public generally, to use said streets exclusively for street purposes; and requiring the company to remove from said streets and alleys all of its tracks, switches, buildings, shops, shanties, structures, tanks, derricks, piles of lumber and iron, and other obstructions, except one main track on its main line west of Elm street, and such number of main and side-tracks, and switches east of the westerly line of Elm street as will be consistent with the proper and ordinary use and improvement of said streets for street purposes; and that the company be perpetually enjoined from using or occupying them, or any part of them, contrary to the permission given by the city, and for such further relief as equity and good conscience may require.

To this cross-petition the company files an answer, in which it admits that the common council adopted, on September 12th, 1892, the resolution set out in the cross-petition. It admits that the city of Ohio, on May 13, 1851, passed a resolution directing the Junction Railroad Company—to whose rights the plaintiff has succeeded—to lay certain tracks, and that on July, 5, 1854, the city of Cleveland granted to the Cleveland & Toledo Railroad Company, and to the Cleveland & Mahoning Railroad Company, the use of certain lands on Bath street. The balance of the cross-petition it denies, except such parts as are admissions of plaintiff's allegations.

The first question to be determined is: Can affirmative relief be granted under the cross-petition, or must its allegations be regarded solely as a defense?

The objections urged by the plaintiff are that the petition is not one to quiet title; that the cross-petition does not contain facts sufficient to give the court jurisdiction to render a decree to quiet title, or to render any affirmative relief.

The petition is, itself, not one to quiet title, as the court held early in the hearing of the case. It simply seeks to restrain interference with its

tracks, side-tracks, switches and turn-outs, on the ground that it has title to the ground on which they rest. There is no prayer for quieting title, but a general prayer for such other and further relief as the court can give.

Sec. 5071, Rev. Stat., as amended, vol. 90, Session laws, 226, provides what the answer may contain by way of cross-claim. Its language is, that the defendants "may claim therein relief *touching the matters in question in the petition against the plaintiff*." It looks to settling controversies on the same subject-matter in the same action, but goes no further. An action to quiet title is purely statutory. Section 5779, Rev. Stat., covers it. It reads as follows: "An action may be brought by a person in possession by himself or tenant, of real property, against any person who claims an estate or interest therein, adverse to him, for the purpose of determining such adverse estate or interest; or, such action may be brought by a person out of possession, having, or claiming to have, an estate or interest in remainder or reversion in real property, against any person who claims to have an estate or interest therein adverse to him, for the purpose of determining the interest of the parties therein." There is no averment in the cross-petition that defendant is in possession of the premises in controversy by itself or tenants, or that it claims to have any estate or interest in remainder or reversion therein.

Counsel for the city claim that the allegations of the petition are such as to make it one to quiet title under the general prayer for equitable relief, although that particular relief is not asked for; and this being so, a cross-petition to quiet title is proper, and may be successfully maintained.

Two cases in our Supreme Court are cited as authorities for this position. One is reported in 35 Ohio St. 597, *Bailey* v. *Hughes*; the other in the same volume, page 567, *Bartholomew* v. *Lutheran Congregation*. In the first case the court held, upon a fair construction, that the petition did sufficiently allege possession in the plaintiff, and defendant's adverse claim; in no manner, however, abrogating the statutory rule that *both must be alleged*. In the second case the object of the suit was to enjoin the defendants from molesting plaintiffs in the control and occupation of a church building, and to *quiet plaintiff's title*. The answer prayed that the plaintiffs be enjoined from using or occupying the church building, or interfering with defendants' use thereof. The court, while it found against the plaintiffs, *quieted title for defendants*, considering the answer as a cross-petition; and in delivering its opinion, used the following language: "As it is unnecessary, in adjudicating as to the rights of the defendants below, to find any fact which was not necessarily and fully found, in determining as to the rights of the plaintiffs below, *on the petition to quiet the title* and restrain the defendants, we are unable to perceive any reason why an order should not be made in the case, on the cross-petition, restoring defendants and their successors to the possession and control of the property for the use and benefit of the congregation, and enjoin plaintiffs and their successors from interfering with such possession and control."

The finding was based, it will be observed, wholly or in part *upon the averments in the petition, asking to have the title quieted*. The case at bar is plainly distinguishable from this, in that the petition herein contains no prayer for quieting of title, and the allegations in it are not sufficient to bring it within the requirements of an action to quiet title, as provided in section 5779, Rev. Stat. The plaintiff company *simply avers title as a ground for an injunction*. But aside from this, there is still the further objection, that

the cross-petition itself contains no averment that that city is in possession of the premises in controversy, by itself or tenant, or that it claims to have any estate of remainder or reversion therein. And if it be true that the plaintiff is in possession, and the city has the right of possession of the premises, the plaintiff would be entitled to a jury trial unless waived, before it could be ousted. But this, while an objection to the court's granting affirmative relief, may still be taken advantage of as a defense. The court is therefore of the opinion that no affirmative relief can be granted under the cross-petition and answer, and that the allegations therein contained, and the proof thereunder, must be considered as matters of defense simply, to the petition.

Let us first see what the issues thus raised are. First, the plaintiff asks for an injunction on the ground that its tracks and side-tracks, switches and turn-outs, on what is known as the Island property, are upon property owned by it, and that it and its grantors have been in constant, uninterrupted and undisturbed possession, use and enjoyment of the same for more than twenty-one years last past, and that its possession and occupation thereof has been open, notorious, and adverse to the city, with claim of title thereto. Second, that the common council of the city, on September 12, 1892, passed a resolution directing the Director of Public Works to at once take possession of some portion of said premises—but which, it is unable to designate—and to remove the company's tracks and other structures; and that the Director of Public Works is about to unlawfully enter said premises, for the purpose of tearing up and removing therefrom the main tracks, side-tracks, switches, and turn-outs, and other improvements. The resolution complained of is as follows, as appears by the answer:

"*Resolved*, That the Director of Public Works be, and is hereby instructed and directed to remove all obstructions from those parts of the following named avenues and streets lying north of the northerly line of Bennett street, to-wit: Waverly avenue, and Andrews, Giddings, Union, Hanover, Hickory, Mulberry, Center, Elm, Sycamore and West River streets, and to prevent any and all encroachment thereon."

The city, however, in its answer goes further, and says that it is its duty to keep *all* streets on the Island property clear of obstruction; and that it proposes to do so ; so that the investigation includes all the streets, or what are claimed to be such, in that part of the city known as the Island property, and particularly described in the petition as bounded north by Lake Erie, east by the government pier and the Cuyahoga river, south by the old river bed, and on the west by the old river bed and a line from the northwesterly end thereof extended to the waters of Lake Erie.

To sustain its claim of title, the Railroad Company introduced the rights granted to the Junction Railroad Company, a corporation formed in 1846. This was in the form of a resolution by the common council of the city of Ohio, passed May 13, 1851, and is as follows:

"That permission be, and is hereby granted to the Junction Railroad Company, to use any streets or alleys in the city lying north and east of Washington street."

The work is directed to be done under the direction of the Committee on Streets. Under this permit the evidence shows the Junction Railroad Company built an embankment, substantially as it is now, running east from the head of the old river bed to the river, on what is called Bennett street, and laid thereon one main track and one or two side-tracks ; and the embankment and tracks so laid crossed the line of all of the streets

mentioned in the resolution of the common council, and of all streets on the Island property running to the lake.

The plaintiff further shows that his company, or its successors, The Toledo, Norwalk & Cleveland Railroad Company, operated the road for a time, and then ceased, taking its last car over the track in 1858, as one witness testifies. From then up to 1866 it was not operated, although the embankment remained substantially intact, and the roadbed and rails as well. Since that time, that company and its successors, The Lake Shore Company, with which it was consolidated in 1869, and the Lake Shore & Michigan Southern Railroad Company, formed in 1869 by the consolidation of The Lake Shore Railroad Company and the Michigan Southern and Northern Indiana Railroad Company, have operated it continuously.

The track built originally by the Junction Railroad Company is substantially the south main track of the present time. The testimony shows, that there were then two long side-tracks; that in 1868 there was one main track and several side-tracks; that in 1869 or 1870 the main side-track north of the present south main track was carried west, making the two main tracks, and that north of the north main track was a side-track to an engine-house; that in 1873 a parallel side-track was built; that in 1875 the breakwater side-track was completed; that the embankment has not been raised since 1868 substantially; that side-track No. 1 north of the main track ran to the engine house in 1868; that side-track No. 2 north of the main track was put there in 1869; that the top of the embankment is from 25 to 26 feet wide at the west end, varying somewhat, up to about 3,300 ft. from the drawbridge, and that from there eastwardly it is about 80 feet wide; that at the west end it is 38 feet high, gradually decreasing as it approaches the river to a fill of about 6 feet at the river; that at its base the embankment is about 40 feet wide; that the embankment was constructed and these tracks laid over and across said streets with the knowledge of the city authorities, and without objection by anybody; that the company made its improvements at an expense of about $250,000. Under these circumstances, the claim is made that the company's tracks and improvements cannot now be disturbed by the city.

As a defense to this the city introduces a large mass of testimony tending to show either a statutory or common law dedication of all the streets in controversy, and that they have been, and should be still under its control; that the fact of their existence has been recognized and accepted by the authorities of both the city of Ohio and the city of Cleveland, by the public generally, and the plaintiff as well, from the time they were originally laid out till the present time; that their character as public streets has never ceased to exist; that they are still subject to the control of the proper authorities of the city of Cleveland; that in 1866 the plaintiff even went so far in its recognition of these streets as to enter into a written contract with the defendant in regard to the use of them, which contract is still subsisting and in full force; that by its terms the railroad company is entitled, east of and including Elm street, to nothing but a single track, and that west of it, all the streets are subject to be opened and improved by the City; and that that contract is revocable at the pleasure of the city.

In order to reach conclusions at all satisfactory, it is necessary to examine the testimony somewhat in detail.

First, as to Bennett street, on the line of a part of which, it is admitted that the railroad tracks and embankment rest. The first that the evi-

dence shows in regard to it is, that there used to be a wagon road along a ridge just south of the waters of Lake Erie, commencing nearly at the river and running westerly; and that near, or a little west of the river, was a mound or hill pretty nearly in the line of the road. This was used as a travelled road from 1835 to 1841, or later, perhaps. Before the railroad was built, the testimony shows, that teams crossed this road to the lake at about where Toledo street is now located; and that since the railroad was built there has been no road crossing the tracks to the lake, except at or near that point. On Ahaz Merchant's map of 1850 it does not appear as a named street, although there appears a division corresponding to it. The other streets in controversy in the Island allotment—so-called—are named on it. In the grant to the Junction Railroad Company by the city of Ohio it is not mentioned. The language used is: "Any of the streets or alleys in the city, lying north and east of Washington street." This would include it, however. On the Cleveland & Toledo R. R. map of 1867 it appears, and it appears on nearly, if not quite all, of the railroad maps in evidence, including the map of 1884, between the different railroad companies and persons claiming to own lake frontage on the island, which was attached to the agreement made between them at that time. It does not appear by name on the Sargent map of 1865, although there is a line of demarkation corresponding to it. The other streets in the Island allotment are named, however. The map in the record of partition of the Island property in this court, and which is claimed to be the instrument which either directly dedicated this property, or was a step in this direction, has it. This was made in 1835. Whether this street and other streets included therein, have received such a dedication as the law recognizes, by virtue of these partition proceedings, is an important question. The history of the partition allotment, or Island allotment—so-called—as shown in the testimony, is as follows: in 1835 N. C. Baldwin, B. F. Tyler, Philander Bennett, Sheldon Thompson, Hiram Pratt, J. B. Macey, Guy H. Goodrich, and W. H. Richards, who owned 9-12ths of the property in question, commenced suit for partition in this court, making as defendants the owners of the other 3-12ths to-wit: W. R., Eliza H., Edward O., John E., Lucia A., Henry R. and Harriet M. Andrews, minor children of Major A. Andrews, and John T. Hudson. In this proceeding, in obedience to the order of the court, John M. Woolsey, Ahaz Merchant, and H. B. Wellman, Commissioners of the Court, aparted to the heirs of Major Andrews blocks Nos. 9 to 12, as shown by the map attached to the report of the commissioners, and bounded them easterly by the old river bed, westerly by Lake Erie, north by the north line of Mulberry street continued. It is to be observed that this description makes no mention of, and crosses, Macey, Thompson and Bennett streets. They also aparted to said heirs blocks 41, 42, 48 and 49, bounding them southerly by the old river bed at its southern extremity, westerly and northwesterly by Lake Erie, easterly by a line parallel with and 2,346 feet westerly from the west side of Willow street on the east side of the old river bed, and northerly by a line parallel with and 666 feet southerly from the south side of West street continued. Andrews and Bennett streets are crossed in this description, but without mention. To John T. Hudson they gave blocks 47 and 40, bounding them westerly by the last mentioned piece, north by the north line of the same continued easterly, and parallel with West street, south by the old river bed, and east by a line parallel with and 1,980 feet westerly from the west side of Willow street. Also blocks 23, 24 and 25, bounded north by the south line of West street con-

tinued, east by the old river bed, south by a line parallel with and 290 feet southerly from the north line, and west by a line parallel with and 1,182 feet distant from the west side of River street. This description crosses Macey and Thompson streets without mention. They aparted the balance of the land on the Island to the other parties to the suit, subject, however, as the report reads: "*To the right of way forever to all owners of said lands above described, on and along the streets marked and laid down on a map of the said island, which was heretofore made by Ahaz Merchant, by order of the owners of the said island, (thereto attached and made a part of the report), and on which the blocks heretofore described by numbers are marked with corresponding numbers.*" The map attached shows the island property divided into blocks and streets. The streets named on it, north of the old river bed, are: Bennett, Andrews, Giddings, Union, West, Hickory, Mulberry, Center, Elm, Sycamore, River, Carter, Pratt, Baldwin, Tyler, Thompson and Macey. This map followed a map made in 1833 by Ahaz Merchant, at the request of Giddings, Tyler and Baldwin, as he certifies, and is acknowledged by them and by Bennett, Andrews and Thompson, as a plat of a village laid out in Brooklyn, Cuyahoga county, at the mouth of the Cuyahoga river, on the west side thereof, and it was filed with the county records. On this map the streets run across Bennett north to the lake, and we find between Bennett street and the lake, lots Nos. 2, 5, 8, 12, 17, 22, 28, 35, and 42, The acknowledgment of the signers to the map did not include, however, all the owners of the property, so that it did not make a good statutory dedication of the plat. The proceeding in partition certainly did not, and it is not claimed by the city that it did, make a statutory dedication of these streets. It is claimed, however, that they constituted one step toward a common law dedication. If there was a common law dedication then, it must have been by the subsequent acts of the owners, coupled with sufficient acts of acceptance by the proper authorities. What was done?

In 1838 the owners of the property, other than the Andrews heirs and Hudson, decided to hold their shares in severalty, and employed Ahaz Merchant to make a survey. Silas Merchant, his son, testifies to this, and that he knew of no streets until they were laid out by his father in 1834, 1835, 1836 and 1837; that in driving stakes for his father at that time he had to wade some, and get onto planks and boats; and that west of the Lake Erie Iron Company it was all swamp.

After the survey was completed, quit-claim deeds were made to each other by the above owners, all bearing date July 15th, 1837, dividing up the property between them. The property is described as block so and so, (giving the proper block number on the Island) of Ahaz Merchant's survey and allotment, as recorded in the record of deeds of said county, being a part of the village plat of Brooklyn, now Ohio City. Subsequently to this, the city of Ohio passed a considerable number of ordinances in regard to these streets, and in regard to changes in the old river bed. After annexation the city of Cleveland also assessed the streets for taxation, and actually bid them in at tax sale, at an expense of $24,000. Some dredging was done before annexation by the city of Ohio, and the refuse was piled up at the foot of the streets—as some witnesses say—and others say it was distributed indiscriminately along the bank and river front, without regard to streets or lots. Bridges were also built at Center, Old River and Willow streets. From 1837 to the commencement of this suit, the testimony shows a large number of conveyances by blocks, all of public record. The com-

mon council of Cleveland also fixed, March 13, 1866, dock lines of the streets of the old river bed, using the lines of some of these streets as monuments. West River, Old River, Macey, Elm, Mulberry, Hanover, Andrews, Giddings, Center and Carter streets, to which the dock lines are deferred, are by ordinance located and defined by stone monuments marked D. L., and mentioned and placed. The contract between the plaintiff and defendant, of 1866, which will be presently referred to, was also made, as well as one or two other contracts bearing upon those streets, all tending, as far as they went, to show an acceptance, or an attempt to accept, these streets by the city, for the use of the public.

There was also a large amount of testimony tending to show to what extent the streets had been used by the public generally, and to what extent the city had actually improved, or done work upon them. Capt. Robinson, whose acquaintance with the Island dates from a very early time, says he is not acquainted with any but Bath, West River, and Willow streets. Mr, Dare, Civil Engineer, who has known the Island since 1837–8, says he does not think the streets north of the old river bed could be found, except with reference to the streets on the south side of the old river bed. He knows and has known for forty years, of no roads across the railroad tracks, except about Toledo street, which is not in the Island allotment ; that B. F. Tyler once made some improvements on Elm street for 200 or 300 feet ; that he never knew Mulberry street as platted ; that there was too much swamp ; that Center street was opened as a road, but never improved within continuous lines, and was, and was used as a private street ; that he attempted to set stakes in Andrews street, but could not find it, or Macey street, by extending lines ; that he had stakes on the lines of West River street, Macey, Elm and Sycamore streets ; that he could not tell accurately the sides of West River street ; that there were three railroad tracks in and about Macey street ; that the travelled road is and was south of Macey street ; that there was many years ago a wagon road partly on Sycamore street, which was the road to the head of the old river bed ; that Elm street was used from 1836 to 1852—part of it—and Sycamore near the hill, from 1836 to 1854 ; that Bennett street was used as a travelled road from 1835 to 1841, or later ; that there has been no driving across the embankment at Elm street for twenty-five years ; that there was no road along the line of Hanover street.

J. G. White testifies that there was no road west of the inclosure around the rolling mill from 1857 to 1861.

D. M. Carrell testifies that there is no evidence of any streets between Elm and Oakland.

Ed. Lewis says he has been in business on the Island since 1854, and that there were no streets ever laid out or improved by the city ; that all the streets he made himself—some eight or ten—and let others use them ; that there was no regular street between the rolling mill and Willow street ; that they went across lots.

J. M. Watts says that since 1867 there has been no road to the lake between Toledo street and Oakland.

George Presley has known about the Island property, and has been in business there since 1843. He says that there have been no streets there, and there are none now, and that during the whole time, he never knew of any work done on the Island by public authority.

Mr. Farrell Gallagher says that Thompson, Tyler, Baldwin, Pratt and

Carter streets were none of them opened, nor were Sycamore or Elm streets ever opened to the lake.

All of the witnesses for the city testify they found no streets or drives across the embankment on which the railroad tracks rest, except at what is known as Toledo street, but which is not in the partition allotment.

On the other hand, Mr. Pat Smith says that seven or eight streets on the Island were plowed up by Jeff Thomas, who was street commissioner in 1854 or 1855, but that some parts of them were so swampy that he could not plow them up; and that after the dredging, the city put a row of spiles in front of all streets.

Mr. Farrell Gallagher, whose memory goes back to 1853, also testifies to the existence and use of some streets between Willow street bridge and the lake. He says that one could drive across Willow street east, and come out where the valley tracks are now on West River street, and that you could drive along near the Lake Shore tracks in what is called Bennett street, north of the swamp, and that there was always a little driveway on Bennett street. Also, as to Macey street he says that a man named Cross once built an ice-house on it, opposite Hanover street, and he drove to it up the streets where the tracks were; that after the dredging was done by the city of Cleveland, one could drive all along up to the head of the river bed; that the road was parallel with the embankment, starting at the head of the island, and fetching up opposite Mulberry street, and thence turning to Macey street, and that it is used to-day, and has been all the time; that Mulberry street was on the edge of the swamp, and extended south of Bennett street all the way up; that he knows Willow street and Toledo street and Macey street, and West River and Bath and Bennett streets; that there were fences at one time on Macey street; that the only road now used north and south would be Mulberry street west of the rolling mill, which starts from Macey and runs out; that there was a road on Macey and Mulberry streets, but they put tracks on it; that there was no road on Macey after one got to Mulberry; that the roads varied some, but there has been driving for the last twenty years; that there is a road on Mulberry street north to the Lake Shore tracks which connects with another road running west.

Charles Giessen, civil engineer and surveyor, located some of the streets by monuments, although somewhat uncertain as to them, within a short time previous to the hearing of this case.

Several witnesses testified to the large number of people crossing Willow street bridge daily at the present time, and going through streets or roads to their work in the rolling mill or for the railroad, or the Island. Several also know that the embankment of the railroad has been largely used for foot travel, its entire length. The court was very fully satisfied that it would be extremely difficult for any one at the present time to accurately locate these streets, even with the assistance of public and private records. Lots and streets are, and have been used indiscriminately, for highways, or for the erection of buildings, or for storage purposes. Obstructions are the rule, rather than the exception, over a large extent of the island. To drive from one end of it to the other on the line of streets as laid out on maps would be impossible. A map has been introduced showing the course necessary to take, in order to drive from the head of the river bed eastwardly to the river. It begins on the right, and at the foot of the embankment at its westerly end, and south of the south line of Bennett

street—as near as the court can judge—and then runs easterly till about midway between Tyler and Baldwin streets—so called ; then it runs south-easterly across block 21, across Hickory street, across block 14, across Mulberry street, and at the south west corner of block 10 it crosses Macey in a northeasterly direction, and runs across Center street onto and across block 6, and then across Elm street and across blocks 3 and 2 ; then it runs across Sycamore street and part of block A, and then at right angles it crosses West River street and runs along Williams street, across Lloyd street, and across the railroad tracks to the lake, just at the river.   The only work that has been done on these streets by way of improvement has been mentioned, with the exception of laying planks between the rails where the road or street crosses the railroad ; and this planking even, as is shown by the evidence, was done by the railroad company, or others in business on the Island, for their own convenience.   There seems to have been no effort, at least since 1866, on the part of the city to improve these streets or to make them useful as public highways for travel, other than by rail or water.   Some of these streets are practically obliterated as streets, and water slips have taken their place.

While there is some contradiction, the fair preponderance of the testimony certainly shows that while there has been some legislative action by the common councils of both the city of Ohio and the city of Cleveland, as to these streets, there have been no physical acts by either of the cities, looking to their improvement, or even their practical location for at least forty years.

Something has also been done by the plaintiff railroad company itself, it is claimed, by way of recognizing the existence of these streets.   The contract between plaintiff and defendant of 1866, is probably as important a recognition as has been made.   Let us consider that and its legal effect. In the 4th paragraph of this contract the company is given the right to occupy, for railroad purposes, any streets north of the old river bed, east of and including Elm street, and west of the Cuyahoga river.   And the proviso connected with this, is that the railroad company shall relinquish to the city any right it may have to occupy other streets in the city west of the river, except its right on its main line, provided the right given shall not infringe on the rights of adjacent lot owners in said streets, or prevent the city from directing or requiring the same to be graded or improved according to law, or the ordinances of the city.   This contract was made, it will be remembered, about 26 years ago.   Then in 1888, the plaintiff company was a party to several deeds wherein the several companies and individuals having or claiming to have interests in the island; attempted to quit-claim to each other certain riparian rights.   In these transfers the Sargent map was adopted and used as reference, and these transfers were put on record. This map shows each street as laid out in the original Ahaz Merchant plat, and measurements and distances are called for from the center of these streets ; but it is to be remarked that in deeding to each other, the grantors did not extend the streets on street lines.   These certainly stand as strong items of testimony, tending to show the recognition by the plaintiff of the existence of these streets.   Then, too, all, or nearly all maps in evidence prepared by the plaintiff, and introduced in some instances by the railroad company, and in some by the city, show these several streets.

Taking into consideration the acts of the owners of the property, and the acts of the public including the plaintiff, and of the public authorities, what is their legal effect as to making a good common law dedication of the

streets in question ? If their effect is to make a good common law dedication thereof, then they are still streets, and under the control of the city, unless they have been vacated by law, or abandoned by non-user. What is a good common law dedication ? Our Supreme Court has said just what constitutes it in the case of *The Lessees of the Incorporated Village of Fulton* v. *John Mehrenfeld*, 8 Ohio St. 440 : "To constitute a valid dedication of a street or highway at common law, there must be not only a dedication to public uses by the owner, but also an acceptance of such dedication by the public ; and these may be shown by the acts and declarations of the parties, and the surrounding circumstances." This is affirmed in the 19th Ohio St. 245, *Wisby* v. *Bonte and others.* In the report of the commissioners in the partition proceeding we find the dedication of the streets and alleys to be subject to the right of way "forever *to the owners of* said lands above described, on and along the streets marked and laid down on the map of the said Island made by Ahaz Merchant, attached to, and made a part of the report. The language used, in the opinion of the court, can hardly be said to indicate an intent to dedicate the streets and alleys to public uses, since it especially limits *the use of them to the owners of said lands*. It is true that those who took in severalty, as well as those who took in common under this proceeding, ratified and adopted the plat attached, and known as the Merchant map. But could they, by so doing, extend the terms of the dedication of the streets and alleys as originally made, and by that mere fact make public the right of way which by special and specific terms had been made private ? Could the public extend its terms any ? If extended at all, they must be extended by *all the owners of the property.* This has not been done. Could the public authorities, by accepting and ratifying a dedication to private use, enlarge it into a dedication to public use without the assent of all the property owners ? Could the public accept what was never tendered ? It certainly seems to the court extremely doubtful.

A very strong case in support of plaintiff's contention that the partition allotment was not and could not be a dedication to the public, is that of the *Mayor of Baltimore* v. *White & Shipley*, 62 Md. 362. The conveyance in the partition deed in that case, for which dedication was claimed, read thus : "And the said Miles While and John H. Barnes, for themselves and all others claiming under them, covenant with each other that they and all others claiming under them shall have free ingress and egress through any and all streets and alleys laid down in Poppleton's plat of Baltimore, which run through the land hereby conveyed." The Supreme Court of Maryland held that to be a clearly personal covenant, "which was to run with the land, and was only intended to benefit and bind parties and privies, and that specific language was used to indicate this purpose, and to exclude all idea of public dedication." And it further held, that the reference to streets by name, and to Poppleton's plat, "was for convenience sake, in having easily ascertained boundaries for their respective holdings, and of the direction in which they might use passages, as their necessities demanded. If this is a private dedication, whatever the right of the purchaser of lands fronting on these streets may be, they cannot be made the foundation of a public right in a suit of this character. Lot owners are not complaining, and are not parties.

There is another case, *The Illinois Insurance Co.* v. *Littlefield*, 67 Ill. 368, and it is along the same line. In that case the conveyance, after describing the lots intended to be transferred, contains the following lan-

guage : " The remaining ten feet off the east side of said lot being reserved for an alley between the parties to this deed," The court held that the purpose of the reservation was not for the use of the public, but for the parties to the deed, and that it made no difference that the alley had been opened for years to public use, or that it was described in several conveyances as an alley, and that the owner paid no taxes; that the purpose was plainly avoided in express terms : not for the use of the public, but for the parties to the deed.

And the Supreme Court of Ohio, in the case of *Longworth* v. *Cincinnati*, 48 Ohio St. 646, uses this language : " Actual dedication, we take it, means unconditional dedication. This implies an intention to yield up to the public every private right in, and every private right growing out of, the land, leaving no right in the former owner except such as he enjoys in common with the public." In that case the municipal corporation had taken a man's land, and made a street out of it without his consent. The owner, upon learning of it, acquiesced in it as an accomplished fact, and ratified it by tendering a deed, and by offering to allow judgment, that, upon the value of the premises being fixed, and payment of the same, he should be ordered to convey ; but the court held that such acquiescence and ratification would not be treated as a dedication of the land to public uses. This case only carried a little further the general principle laid down in the *Mehrenfeld* case already referred to. Under that principle, the court is unable to discover in this partition proceeding, any intent on the part of the owners of the land to make a dedication of those streets and alleys to the use of the public ; nor can the court find from the evidence that all of the subsequent owners showed a clear and manifest intent to so dedicate them.

After the partition allotment, we find that those who took in common what was left after the heirs of Andrews and Hudson had their shares set off, divided the property among themselves, always referring to the plat made by Ahaz Merchant ; and from that time to this, so far as the records have been introduced, transfers nearly all refer to this plat for description. There is a large number of conveyances on the Island from 1837 down, in evidence, and in a great number of them the transfers are by block. In some cases, however, streets are conveyed, no attention being paid to them. It does not seem to the court that the terms of the original dedication can be extended by a part of the owners of the property, as already suggested. The terms of the dedication of the streets limit their use to the owners of the property. The public cannot make them public streets against the express dedication to private use, by using them; neither can the city authorities accomplish that result by legislation in regard to them, as held by the Supreme Court of Illinois in the case cited, and by our own Supreme Court in 19 Ohio St. While it is true that slight acts on the part of the city will amount to an acceptance of a dedication, and while it is true that there may have been enough done by the public authorities to make it an acceptance of those streets, so far as they are concerned, such acts cannot be properly considered as extending the original terms of the dedication, or accepting what was not tendered. A taking what was not offered would be an appropriation, and the law provides how that may be done.

The opinion of the court then is, that as to the streets and alleys in what is known as the Island, or partition allotment, there has been no sufficient statutory or common law dedication.

The remaining question as to this allotment then presents itself: Is the plaintiff company, by the acts of recognition referred to, and notably by the contract of 1866 with the city of Cleveland, estopped from now claiming that these are not streets?

The doctrine laid down by our Supreme Court in the case of *Coakley* v. *Perry & Payne*, 3 Ohio St. 344, is, that estoppel applies only where the grantee in the conveyance receives and holds possession *under the conveyance*, and relies upon it as his source of title; and not where the grantee holds the title under a prior, independent conveyance. In this case the plaintiff did not hold or take possession under the contract of 1866 with the city of Cleveland. It had possession for many years prior thereto under an arrangement with the city of Ohio, made by its predecessor, the Junction Railroad Company, and the court fails to see why, under this decision, it is by the contract of 1866 estopped from saying that the streets in controversy are not, in fact, streets.

There is still another difficulty as to the streets involved in the resolution of the common council complained of, *north of the north line of Bennett street*. There has not been a particle of testimony tending to show any act by the city, as to the shore end of any of the streets on the Island allotment, and none to indicate any use by the public, at any time since the so-called allotment, of any portion of these streets north of the north line of Bennett street. There has been an utter and complete abandonment, ever since they were laid out. There has not been a single physical act done by the city on any of those streets north of Bennett street. The shore line for a great part of the distance east of Pratt, and west of Center street, has been so eaten into by the lake, that whatever street lines may have existed north of Bennett street, have disappeared; and were it not for the embankment and between 40,000 to 50,000 carloads of stone placed on, and north of, the embankment, by the Lake Shore Railroad Company, the old shore line of 1835 could not be found to-day. Certainly, so far as these portions of the streets are concerned, there can be no question as to their complete abandonment for more than forty years by the city. If the Island, or partition allotment, more properly speaking, is not a good statutory dedication of the streets therein named, and if the subsequent owners of the property, and the proper authorities and the public generally, have not by their acts made a valid common law dedication of the streets therein named, it must follow that what are claimed to be streets are not, in fact, such, and that the basis upon which the city claims its right in these streets, and the right to remove the obstructions complained of, must fall.

We now come to the consideration of what is called West River street. It was originally laid out as a public road in 1831 or 1832 by Alonzo Carter, and known as Lake street. Then in 1832 the county commissioners enlarged it into a county road sixty-six feet wide, which they laid out, beginning at the intersection of Center and Detroit streets, and thence running along the westerly side of the Cuyahoga river until it reaches the lake. This was done in accordance with the provisions of law in such cases made and provided, and it was then called River street, and subsequently West River street. In 1833, N. C. Baldwin and others laid out what is known as the Buffalo Company allotment, recognizing this road as a street, and completing a statutory dedication of it. The west or north line of this allotment, however, did not extend to the lake shore. It stopped at the west line of block A of said allotment. Subsequently, in 1837 or 1838, the ship channel was opened, and a part of the street was

thus placed on the north side of the old river bed, and with it two other streets, Old River and Willow streets, and two blocks.   In 1835 the partition suit before mentioned was instituted, and partition made as well of this allotment as of the Island allotment, with this difference, that in the Buffalo Company allotment there was no limitation of the right of way to the owners.   In 1836, the 3rd of March, the village of Ohio was incorporated embracing this street within its territorial boundaries.   There being a statutory dedication of this street, the question whether it still remains a street, or whether it has been abandoned, and by non-user has ceased to be a street north of the old river bed.   The testimony of Mr. Dare shows that it was used as a street in 1838.   It appears on a map, used by Delamater and the ship channel commissioners, in 1854, and also on the map attached to the contract for dredging.   Farrel Gallagher says he knew of it, and that the hill or knoll commenced just at West River street, and that the first bridge he knew of was at West River street, for foot passengers, and remained there till the river was widened in 1854 or 1855, and that there was no bridge there after that, till the Valley Railway bridge in the 80's, and that there was a roadway the width of West River street to the lake within the last thirty years; that there was one till the Valley Railway tracks were laid in 1880; that he saw wagons there; that they crossed Willow street and turned to the right down to the dock, and struck West River street between 200 and 300 feet from the ship channel; that he had not seen them cross the tracks, however, in twenty-five years, but had seen them drive up West River street in that time, and had seen them driving on the east side of the railroad track in West River street last year; that there is a saloon now on West River street, and that it is on the street with the tracks, and moved there last year.

James Sturvenant and Otto Dercum surveyed the land on West River street, and presented a plat of it in evidence, taking as a starting point the Cathon corner, as it is called—that is the corner of the Meyer & Osborn block of to-day, running it from there to the south shore of the old river bed, and from there to the lake shore, using the old road records.   The result of these measurements differed some from the old road records, north of the ship channel.   Sturtevant found no improved street, nor any road running in the direction of any street north of the old river bed.

Charles Giessen made a survey in 1892, and testifies to substantially the same thing.

Pat Smith testifies to a bridge at West River street at an early date, and that there was a road to the lake by the head of the pond; that in 1847 or 1848 a roadway was made across the end of the pond, and Tisdale and Johnson filled up some holes around there for a yard, and that he filled up some too.

George Pressly says there were no streets, either traveled or in a direct line, and there were none ever worked by the public authorities north of the old river bed.   He was on the Island, and just across, on the south side of the ship channel at the end of Willow street, from 1845 up to six or seven years ago, and he says that during the whole time he was there, he never knew of any work done on West River street on the Island by the public authorities; that Johnson and Tisdale and he, kept the roads open.

Ed. Lewis has been on the Island and in business since 1852, in the Lake Erie Iron Works, located just where they are now.   He says no streets have ever been laid or improved by the city, and that he made them

all himself, and let others use them—eight or ten of them—and he made them just wherever they could get through.

Mr. Dare knows of no road since 1837 or 1838 that would be on the line of West River street north to the lake. The ship channel was completed in 1863, he says, and he had stakes on the line of West River street as originally laid out; that he has driven on it a little way, and when he got off it was because of obstruction, or because he wanted to; that there was a pond near West River street connected with the bayou; that he could not tell accurately the side lines of the street, but he knew about where they were; that there was considerable driving across it; that between the pond and the ship channel there was only a few hundred feet; that the present wagon road runs across West River street, and goes through Toledo street on the line of West River street. He never knew of a bridge for teams.

John G. White knew the Island from 1857 to 1862. He says that in crossing the Willow street bridge, the road followed westerly along the bank of the river around to the Otis Iron Works; that there was a high picket fence there going at right angles toward the lake; that the road ended between two buildings, not reaching the embankment at all. And with that exception he swears there was no defined track anywhere, and no traveled road in any direction; no road that stayed in one direction, although following some general direction.

J. M. Watts says the roadway from Willow street bridge has been the same since 1868.

C. L. Russell says that West River street went to the lake, and the east end of the Buffalo Company purchase; that he was one of the ship channel commissioners, and knew of no work ever done on the north side of the ship channel on West River street; that he did some work on West River street between the southerly side of Main street, and the bend at the bridge.

In 1881 the city of Cleveland made an agreement with the Valley Railway Company, whereby it gave permission to that road to use and occupy West River street 442 feet easterly of the old river bed, and thence westerly through said street 1640 feet to the tracks of the Lake Shore & Michigan Southern Railroad, crossing the old river bed by the draw-bridge; and permission was also given to construct a switch-track through West River street, running from the above track.

Some other witnesses were examined in regard to this, and some ordinances passed by the city were introduced. But the clear preponderance of the evidence certainly shows that the city of Ohio, while it had control, and the city of Cleveland since, have done nothing whatever by way of use or improvement of this street, *north of the old river bed*. It was improved up to that point before 1840, but nothing beyond it. The testimony, it is true, shows there was some little dredging in front of it, in common with the rest of the river frontage on the old river bed, and the earth thrown back; but from there to the lake, nothing has been done from that time to this, and it has not been used by the public generally as a street during all that time, within its allotted lines. It would be difficult to find a clearer case of abandonment. In so holding, the court is not unmindful of the fact that in 1881, the city gave permission to the Valley Railroad Company to lay its tracks thereon. But the fact that it assumed that power after nearly forty years of abandonment, and made the contract mentioned, cannot bind the plaintiff so far as its rights exist by virtue of the abandonment.

As to Sycamore, Willow, and Old River streets, laid out in the Buffalo Company allotment, the clear preponderance of the testimony shows that none of them have ever been used or improved by the city authorities, and that the public generally has not used them as streets since 1854, at least. The Willow street bridge—so called— is *not* at Willow street at its northwesterly end, and the road leading north from it, does not follow the line of Willow street as laid out. Sycamore street, although some parts of it around the bluff were used originally by the public from 1836 to 1854, since that time has been used, the evidence shows, for storage purposes by the different people in business there, rather than for the purposes of a street. The traveled road running west runs across its line diagonally.

As to what is abandonment, the court is, of course, guided by the opinion of the Supreme Court in *Nail & Iron Company* v. *The Furnace Company*, 46 Ohio St. 544. In that case the court says: "It appears to be well settled by the authorities that in order to work abandonment by simple non-user of an easement, all acts of enjoyment must have totally ceased for the same length of time necessary to create the original presumption. And we hold that where non-user by the public of a street within a city is relied upon as proving an abandonment, such non-user must be shown to have continued for a period of twenty-one years." Applying this doctrine to the non-use of these streets, as shown by the testimony, how is it possible for the court to reach any other conclusion than that there has been a legal abandonment, so far as the right of the city is concerned to set up their existence, as a defense to the action of the plaintiff?

We now come to the consideration of Bath street, as it is called, and the Wittelsey & Lloyd allotment, north of the old river bed. Bath street is all north of the north line of lot 191, and includes all the land from that to the lake, four or five acres, perhaps.

Bath street first appears on what is known as the Pease map. This map was never recorded as required by law; but it was made for the benefit of the Connecticut Land Company, and that company used it from the time it was made, 1796, till 1800, when it employed Mr. Amos Spafford to re-survey its lands, and he did so on the same lines that Pease had surveyed. The map made by him was, in accordance with law, placed on record at Warren, Trumbull county, in 1802. On this map Bath street occurs as lying on the east side of Cuyahoga River next to Lake Erie, and terminating on the west at the junction of the river and lake in an irregular shaped piece of land. In 1814 the legislature incorporated the village of Cleveland, and in the act of incorporation provided that so much of the city plat of Cleveland in the township of Cleveland, Cuyahoga county, as lies northwardly of Huron street—so-called—add westwardly on Erie street—so-called—in said city plat, as originally laid out by the Connecticut Land Company, according to the minutes of the survey and map thereof now on record in the office of the recorder of said county of Cuyahoga, shall be a village corporation. This was a clear recognition and adoption of the Spafford map by the legislature, and is without doubt a good and valid statutory dedication. It has been repeatedly recognized by our courts, notably in the case of *Holmes et al.* v. *C., C., C. & I. R. R. Co. et al.*, U. S. Circuit Court, 8 Am. Law Register, 716; the *Public Square case*, decided by Judge PRENTISS in this court; and in *Gleason* v. *The Park Commissioners*, 49 Ohio St. 94.

In 1826–27 the United States Government changed the channel of the river bed, cutting through Bath street at its westerly end, and leaving a

triangular shaped piece of it, on the west side of the river. It was thereby thrown into Brooklyn township, and so remained till 1836, when Ohio City was incorporated by the legislature. The city of Cleveland was incorporated at the same session. The two acts of incorporation make the river the boundary between the two cities, in the opinion of the court, so that the part of Bath street cut off, was then embraced within the corporate limits of Ohio City ; and that city exercised control over it, and passed ordinances in regard to it. June 5th and 6th, 1854, the cities of Ohio and Cleveland were annexed. On the 10th day of June, 1854, less than a week after the annexation, action was taken by plaintiff and defendant as to Bath street. Communication was made to the city council from the Cleveland & Mahoning, and the Cleveland & Toledo Railroads, in which they say they occupy a portion of Bath street, and ask that they be permitted to occupy it for the time being. June 14th, 1854, the common council acted favorably, and authorized an agreement with the railroad companies for the possession by said roads of certain parts of Bath street north of the Government Pier, on the payment of $5,000 by each. The parts so leased were described as follows : That part as laid out by the Connecticut Land Company which lies between the center of the channel of the Cuyahoga river—as the same then was—to the west bank of the same—as it has been since the erection of the Government Pier at the mouth of said river—with the exception of a strip 150 feet in width, extending from the west bank of the river—as the same now runs—to the center of said channel—as it was prior to 1827—upon a course bearing south 55 degrees 13 minutes, west to the northerly line of the strip which intersects the easterly edge of said westerly line or bank of the river, at a point 152 8-10 feet triangular distance from the southerly line of Bath street ; which last named street is hereby reserved for the purpose of an ordinary street ; also reserving the west pier of Cuyahoga river, which is also reserved for the purpose of a highway. This appears to cover all the testimony as to Bath street on the west side of the river, and so far as appears from the testimony, no action whatever has been taken in regard to it of any kind or descriptiom, from July 10th, 1855, up to the present time, a period of nearly forty years.

On the other hand, what action has been taken tending to show abandonment by the city, of Bath street? The most important, perhaps, arises from the consideration of the Whittelsey-Lloyd allotment, so-called. This was made by Charles Whittelsey and A. M. Lloyd, who certifies that he is the attorney for W. B. Lloyd, in February, 1848, and was statutory in its character. It covers all west and north and east of West River street of the property in question, and other property as well. The title of the property was obtained by them through the Connecticut Land Company, and when it came under control of the city of Cleveland, the record contained many transfers under that allotment, from and to Whittelsey and Lloyd. Within the lines of this allotment are three streets : Lloyd, William and Albert. William street being known on later maps as Toledo street. One of these streets—Albert—is wholly within the boundary of what was formerly known as Bath street, and part of Lloyd street, and about half of Toledo street are within these boundaries. This is shown by extending the south line of Front street, which would make the south line of Bath street. The allotment was laid into forty-five lots, and numbered consecutively, and divided by the lots and streets mentioned, and certain alleys; and the lots have been the subject of conveyance from the

date of the allotment to the present time, references being fully made thereto in the conveyances themselves. This has been going on for forty years. What has the city done by way of recognizing this allotment? So far as this case is concerned, it is especially pleaded and claimed by it, that the contract of 1866, between the city and the plaintiff, especially mentions these streets which can only exist by virtue of it. Testimony—and a considerable amount of it—has been introduced, tending to show use of these streets by the public up to the present time, especially Toledo and Lloyd streets. It is difficult for the court to see how the two claims are consistent. January 26th, 1855, the common council passed an ordinance changing the names of certain streets. Among them was William to Toledo street. William street is one of the streets laid out by the Whittelsey & Lloyd allotment. Its existence has been repeatedly recognized by the plaintiff since that time. The city has also repeatedly recognized the existence of streets mentioned in the Whittelsey & Lloyd allotment. In its cross-petition it does this very thing; and these streets cannot exist if Bath street does. If Bath street was not abandoned by the city on the west side of the river, and is still a street, what becomes of this allotment? What of Albert street and half of Toledo street and William street, and part of Lloyd street? Each of these streets are claimed to exist by the city, but located south of the south line of Bath street. About one-half of the allotment is on Bath street, and the other half south of the south line. All maps of the city of Ohio and the city of Cleveland, introduced by the city, which were made by the Whittelsey & Lloyd allotment, show it, notably that of Merchant, published in 1850, and fully identified by Silas Merchant, his son. If the city accepted this allotment, it abandoned Bath street as laid out originally. It cannot claim rights under both positions.

Judge MCCLAIN, of the U. S. Circuit Court, held, in the case of *Holmes* v. *C., C., C. & I. Railroad Co. et al.*, that Lloyd got no title to the land in this allotment; but his decision did not relate to the land in controversy here, and to the land purchased by Whittelsey of the Connecticut Land Company. The relative claims and situations of the parties were not the same, and the pleadings were not the same as in the case at bar. Now, in what condition does this leave the parties as to the three streets in controversy? It certainly gives the city control and supervision over them, and the right to contract in regard to them so far as it is not limited by law, if it has not lost it by abandonment. There has, so far as the evidence shows, never been work done on either of these streets by the city, and no control exercised over them by it, and no travel over them by the public. They are only known on paper. There are no roads, and have been none for over thirty years on the line of them. The only one that can be taken for a road is the one used by icemen to go to the lake, and by persons desiring to go to the railroad freight-house; but that road is not on the line of a street. It crosses the line of Toledo street. There is no road on the line of Toledo street; neither is there any on the line of Albert street or Lloyd street. There are ways, but not in the lines of these streets. The ways are merely roads running irregularly across and over streets and lots indiscriminately for the convenience of those desiring to get about the Island. Not a thing has been done in all this time by way of working, grading, or improving. No physical act has been done by the city on any of these streets, and the public has not used them as streets. It is difficult to see how streets could, in fact, be more completely abandoned than these, whether they are considered as parts of

Bath street, or as distinct streets under the Whittelsey and Lloyd allotment. The evidence clearly brings them within the decision in the 46 Ohio St. before referred to.

There still remains the question of the revocability of the grant originally made to the Junction Railroad Company by the city of Ohio. As a defense to the action it does not seem to the court that it can be considered. It certainly has not been revoked in terms. The original grant was to use all streets and alleys lying north and east of Washington street, without naming any streets or alleys. It certainly cannot be considered such a revocation as the Court can consider, to merely pass a resolution to remove obstructions from parts of certain streets which do lie north and west of Washington street. Neither is it a sufficient revocation for the city to aver in its cross-petition that it is the duty of the Director of Public Works to remove all obstructions therein. Although it may be within the power of the city to revoke it, it is not yet revoked.

Then further, as to the effect in this action, in view of the findings now made, of the contract of 1866, between plaintiff and defendant already referred to. In the opinion of the court the right of the plaintiff to an injunction is not based in any manner upon that contract, but upon the grant to the Junction Railroad Company, and its continued possession of the property in controversy, as alleged in the petition. If the streets named in the contract of 1866 are not in fact streets, and the company holds possession of the property, not by virtue of its provisions, but by rights theretofore acquired, it can be of no force *as an answer* to the petition, and the plaintiff is not estopped thereby.

Other questions were raised upon the hearing; but the views expressed render it unnecessary to pass upon them.

With these questions disposed of, it follows that the defense cannot be sustained, and the injunction is ordered as prayed for in the petition.

In conclusion, the court desires to pay just tribute to the elaborate research, both as to law and testimony, by counsel on both sides. It necessarily involved weeks of labor, and an investigation of records running from the formation of the Connecticut Land Company to the present time, as well as an examination of council records, maps, etc., and the decision of courts of last resort of many states. I desire to extend my warmest thanks for the assistance thus rendered the court.

*Estep, Dickey, Carr & Goff,* for plaintiff.

*Lawrence, Estep, Weh & Henry,* for defendant.